---

(41 Misc. Rep. 263.)

In re BRUGH'S WILL.

(Surrogate's Court, Erie County. July, 1903.)

1. WILLS—UNDUE INFLUENCE.
　　A woman who became insane in 1865 was confined in an asylum for 13 years, and in 1881 she went to live with certain persons, who were no relations, and lived with them until 1902, when she made a will making them her sole beneficiaries, and died shortly thereafter. She had had litigation with her only sister, who was her committee, and did not obtain possession of her property until 1893. *Held* sufficient to show that the will was her free and voluntary act.

In the matter of the probate of the will of Jan Le Breton Brugh. Probate granted.

Jacob Stern, for proponents and Robert C. Titus, executor.
William G. Cooke (Henry F. Allen, of counsel), for Mary Le Breton Mitchell, next of kin, contestant.

MARCUS, S. Jan Le Breton Brugh died October 6, 1902, leaving personal property valued at about $14,000. She left, her surviving, Mary Le Breton Mitchell, her sister, who is her sole next of kin. The instrument propounded for probate as and for her last will and testament was executed July 15, 1902. In that will the decedent bequeathed all her property to Samuel M. Stuart, his wife and children. The legatees are not relatives of the deceased, either by blood or marriage. The probate of the will was contested by the sister upon the ground that it is not her free, unconstrained, or voluntary act, and upon the further ground that the decedent was not of sound mind and understanding.

Out of the voluminous testimony presented for my consideration, the following are regarded as the essential facts: The deceased was born in 1827. She came from ancestors distinguished in the public service of this state in the early period of its history. Her father died in 1830, and her mother in 1833. .She was reared and educated by relatives as became her station in life, and according to the custom and practice of early days. In 1840 she married. In 1865 she became

insane through the birth of a child, and was thereafter confined in a lunatic asylum until 1878, although from 1872 until her discharge in 1878 she was in the convalescent hall attached to the hospital, attending to various duties that had been assigned to her. Upon leaving the asylum she went to live with her aunt, Emma Sanford, in Gowanda. In 1881, on account of treatment and under the belief that her aunt intended to send her back to the asylum, she left the home of Mrs. Sanford, to live with the family of Samuel M. Stuart, in Hamburg. In 1881 she applied to the Supreme Court for the removal of one George J. Greenfield, then her committee, and for the restoration of her property. The proceeding resulted in the continuing of the committee, but allowed the deceased to select her residence and the persons with whom she desired to live. In 1888 her sister—this contestant—was substituted for Greenfield as committee of her person and estate. In 1889 the deceased again applied to the Supreme Court for the discharge of her sister as committee, and also asked that the property held as such committee be transferred to the deceased. Then followed a protracted litigation between the sisters. Mr. George Gorham, to whom the matter was referred, reported that the deceased was competent to manage herself and her affairs. His report was confirmed by Mr. Justice Lambert, and on appeal to the General Term the same was affirmed; and in 1895 the Court of Appeals dismissed the appeal of Mrs. Mitchell to that court. In 1893 the decedent received from her committee, after deducting costs and expenses, approximately the sum of $64,000. About that time the decedent gave to Samuel M. Stuart a power of attorney to act for her, and Stuart seems to have continued to do business for her until she died.

In one of the decedent's letters she says:

"I have this day given to my uncle Samuel M. Stuart a power of attorney to act for me. I have known him since May 25, 1873, and he never betrayed my trust. It was the wish of Honorable Edward Sanford, my uncle, that I should cling to him, and I shall follow his advice."

Through all her trials the evidence discloses the Stuarts to be steadfast in their friendship. In a postscript to a letter written by the deceased to Mrs. Blackmon in 1893 she says:

"You speak of my generosity to uncle Samuel's family. I never shall have money enough to reward them for services rendered me for the past thirteen years. They have watched and protected me constantly from enemies far and near. They have advanced money to carry on a long litigation not knowing that they would ever be compensated for either money or services, and were it not for their true friendship I would to-day be in an asylum or in my grave. Yours was the service of a day. Theirs for years."

The Stuart family undoubtedly from time to time received large sums of money from the deceased, causing her property to diminish from the amount which came to her in 1893 to the amount she possessed when she died. The deceased was a woman of refinement and intellectuality. She had a feeble mind. She was afflicted with deafness. She was shy of strangers, and lived a quiet and secluded life in the family of the Stuarts and their children, and in their society and in the society of their friends. Under all the circumstances of this case

the contestant contends that, because of the confidential relations existing between the deceased and the Stuarts, the proponents must establish affirmatively that the will asked to be admitted to probate is the product of the mind of the deceased, and is her free, voluntary, and unconstrained act.   While not sustaining the contention of confidential relations, it seems to me that the proponents have affirmatively established that the testamentary dispositions of her property, as found in the will, emanated from her mind, and that the execution thereof was her free, voluntary, and unconstrained act.   The proceedings in the Supreme Court settled the question of her competency to manage herself and her property.   She made a will before that time, for in 1894 she writes in a letter to Mr. Stuart:   "I desire to make a new will, because the one I have calls for more money than I have. Please give this your immediate attention.   I am so happy in my new home and my every wish is gratified."   Again, in the same year she writes, in another letter to Mr. Stuart, "I am desirous of making a will which will secure my money in the possession of you both and your children."   In 1896 the deceased called on Robert C. Titus, then a justice of the Supreme Court in this county, in his chambers in the city and county hall in the city of Buffalo, and he prepared a will under her directions, by which she bequeathed all her property to the Stuarts. The will in question in this proceeding was drafted by Judge Titus, who sent Frank J. Titus, an attorney in his office, to the deceased to witness the will and superintend its execution.   While I realize that a substantial argument might be made from which directly opposite conclusions would be warranted than those reached by me, along the lines of an enfeebled mind, long confinement in the lunatic asylum, and certain eccentricities developed either through the encroachments of old age, or from such feebleness and enforced confinement and the distressing effect such circumstances might have made upon the decedent, who was a woman of an extremely delicate and nervous temperament, and that the beneficiaries under this will are not blood relatives or relatives by marriage, and that such beneficiaries have received in the course of their association with the deceased many substantial gifts of large sums of money, with all the pathos and struggles which mark the life history of this woman, it nevertheless seems to me that the deceased, from motives of affection and gratitude, chose the Stuarts to be the objects of her bounty, rather than her sister, and this view of the case I am constrained to follow.

There are innumerable evidences appearing throughout the history of this whole proceeding covering the period that the deceased resided with the Stuarts, which satisfy my mind that a steady and continued design and purpose, prompted by the high motives of affection and gratitude, was ever uppermost in her mind, to make the Stuarts, whom she believed to be responsible for her happy existence, the beneficiaries of her estate.   While the evidence might be fairly construed to show that the mind of the deceased was somewhat enfeebled, it nevertheless appears that her mind was sufficiently strong, as manifested by her various letters in her own handwriting testifying her delight in the way she was being treated, and manifesting gratitude and af-

fection for the Stuarts, and showing a purpose, fixed and strong throughout all those years, to ultimately reward the Stuarts and their children for what the decedent considered, to use her own words, "Yours was the service of a day; theirs [referring to the Stuarts] for years." A decree may be entered granting probate.

Probate granted.